UNITED STATES of America,
Plaintiff–Appellee,

v.

Susan Carol BRIGGS,
Defendant–Appellant.

Nos. 90–1201, 90–1204 and 90–1205.

United States Court of Appeals,
Fifth Circuit.

Jan. 4, 1991.

---

**44.** *Id.* at 828.

Robert Udashen, Dallas, Tex., for defendant-appellant.

Delonia A. Watson, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, KING and DUHÉ, Circuit Judges.

GOLDBERG, Circuit Judge:

Susan Briggs stole over $5 million dollars from her employers by initiating wire transfers from their accounts to hers and others'. She pled guilty in 1986 to charges of bank fraud and transportation of stolen money and was sentenced to a total of thirty years' imprisonment. Subsequently, in a 28 U.S.C. § 2255 motion, she challenged the bank fraud (18 U.S.C. § 1344) conviction, arguing that her plea was not knowing and voluntary because her criminal acts did not constitute bank fraud. Briggs' motion was denied, and she appealed. She also requests resentencing on the remaining counts, although she does not challenge their validity.

Because we find that Briggs' plea was not supported by facts sufficient to constitute bank fraud, we vacate her conviction for bank fraud and remand in order to allow her to enter a new plea. In addition, we vacate her sentence on the transportation of stolen money charges, and remand in order that the district court either 1) supplement the record to show affirmatively that it did not consider the invalid bank fraud conviction in sentencing Briggs on the other charges; or 2) resentence Briggs free from any consideration of the invalid conviction.

## I. Facts and Proceedings Below

From 1981 through 1986, Susan Briggs worked for Electronic Data Systems ("EDS") and Southmark Corporation, both located in Dallas. She was employed in the Treasury Department at EDS and as an Assistant Cash Manager at Southmark. Her duty at both corporations was to cause transfers of funds from company bank accounts "when necessary for actual business transactions." See Rec. Excerpts at

58, 59 (Defendant's Factual Resume). The record does not otherwise detail the scope of Briggs' authority nor indicate to what extent, if at all, the banks were responsible for monitoring and policing the legitimacy of her transactions.

Regardless of the exact scope of her authority, Briggs exceeded the bounds when she decided to instigate some transfers of her own. From 1984 through 1986 she initiated over a dozen unauthorized transfers from company accounts belonging to Southmark and to National Heritage Insurance Company, an EDS subsidiary. These transfers were made to Dallas accounts belonging to herself, her two sons, and a friend. Some of this money she and her friend then transferred from their local accounts to accounts in the Cayman Islands. So far as the record discloses, Briggs' employers suffered these losses, not the banks from which the money was transferred.[1] There is no indication that the banks were or could have been found civilly liable to EDS and Southmark.

Precisely how Briggs effected these transfers is unclear. The factual resume supporting Briggs' plea states merely that she "caused" various wire transfers; the indictments use the same phraseology. A letter from Southmark's counsel states that Briggs accomplished her scheme by "manipulation of wire transfer instructions." An FBI agent testified at the preliminary hearing that Briggs had "authorized, initiated" or "intiat[ed] and approv[ed]" at least one of the wire transfers, and that the transfer had been "physically initiated" by a bank employee "based on instructions from" Briggs. The nature and content of these instructions is not revealed.

By late 1986 Briggs' extracurricular activity had netted her $5.2 million and a variety of criminal charges. The latter,

filed August and September 1986 in two indictments and an information, consisted of three counts of bank fraud (18 U.S.C. § 1344), seven counts of wire fraud (18 U.S.C. § 1343), ten counts of transportation of stolen money (18 U.S.C. § 2314), and related counts of conspiracy (18 U.S.C. § 371) and aiding and abetting. Briggs pled guilty to two bank fraud counts and four stolen money counts, in exchange for which the government agreed to dismiss the remaining charges and prefer no other charges relating to her employment with EDS and Southmark. She was sentenced to a total of twenty years on the stolen money charges and ten years on the bank fraud charges, with these sentences to run consecutively. She began serving her sentence in December 1986.

Briggs did not appeal her convictions, but she did file a motion for reconsideration seeking reduction of her sentence, pursuant to former Fed.R.Crim.P. 35.[2] It was denied. In April 1989, she filed a 28 U.S.C. § 2255[3] motion to vacate the judgment and sentence as to the bank fraud conviction. In March 1990, the district judge adopted a magistrate's recommendation that the motion be denied. Briggs subsequently appealed.

Briggs attacks only the judgment and sentence as to the bank fraud charges, which account for ten years of her thirty-year sentence; however, as remedy she seeks not only reversal of the bank fraud charges but also resentencing on the remaining transportation of stolen money charges.

## II. Issues

This case presents several questions. Central to our inquiry is the interpretation of former 18 U.S.C. § 1344, the bank fraud statute. We also consider whether Briggs'

---

1. The record in this case is very bare, consisting primarily of testimony at three hearings and the brief factual resume supporting Briggs' plea.

2. Former Rule 35(b) provided: "A motion to reduce a sentence may be made ... within 120 days after the sentence is imposed...."

3. Section 2255 provides in pertinent part:
 A prisoner in custody under sentence of a court established by Act of Congress claiming

the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

guilty plea precludes her challenge to this conviction, the nature of the remedy to which she is entitled, and whether she must be resentenced on the other charges.

## A. Bank Fraud Statute

As enacted in 1984, and as applicable to this case, the bank fraud statute provided in relevant part as follows:

> (a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
> (1) to defraud a federally chartered or insured financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be [fined or imprisoned].

*See* former 18 U.S.C. § 1344(a).[4]

Briggs was charged under an indictment and an information whose language comprehends both provisions of § 1344(a), so her conviction will stand if it can be sustained under either subsection. *Cf. United States v. Medeles*, 916 F.2d 195, 197–98 (5th Cir.1990) (where indictment and jury charge do not allege elements of a subsection of statute, conviction cannot be sustained under that subsection). We consider each provision in turn.

## 1. Defrauding a Bank

■■■ Former subsection (a)(1) prohibits "a scheme or artifice ... to defraud a

financial institution." Briggs contends that this section is inapplicable to her conduct, as her employers suffered the losses, not the banks. The banks were not even exposed to liability, so far as the record indicates. Accordingly, Briggs argues, she may have defrauded her employers, but not the banks.

Now, in light of the fact that the mail and wire fraud statutes have been used to prosecute frauds against *intangible* property rights, one might construct a response to Briggs' suggestion. Conceivably, the banks, though they are not Briggs' employers, have a right to expect honesty in the performance of her duties related to wire transfers. Maybe this right is an intangible property right. Perhaps Briggs defrauded the banks of this "property." In a strictly grammatical sense, the charges to which Briggs pled guilty might seem open to such an interpretation, because the verb "to defraud" appears in both without an indirect object specifying what she stole.[5]

However, the government does not make this argument (or any argument with respect to subsection (a)(1)). It is not hard to understand why. Even if grammatically plausible, an intangible property rights interpretation of these charges would be strained at best. Neither the indictment nor the information to which Briggs pled guilty mention intangible property or the right to honest services. As overt acts supporting the charges, both cite only the

---

**4.** A 1989 amendment substituted the term "financial institution" for "federally chartered or insured financial institution." *See* Financial Institutions Reform, Recovery, and Enforcement Act, Pub.L. No. 101–73, tit. IX, § 961(k), 103 Stat. 183, 500 [hereinafter FIRREA]; 1989 U.S. Code Cong. & Admin.News 86, 196–97 (legislative history of amendment); *see also* 18 U.S.C. § 20 (defining "financial institution"). Briggs' conduct and prosecution occurred under the unamended version of the statute, but our discussion is equally relevant to the statute as it exists today. The numbering has changed, however, from §§ 1344(a)(1) and (2) to §§ 1344(1) and (2).

FIRREA also increased the penalties for violation of § 1344. *See* FIRREA, § 961(k); 1989 U.S.Code Cong. & Admin.News 86, 196–97. This change was one of several that reflect the

gravity of fraud in the banking system. *See, e.g.,* FIRREA, §§ 961(i), 961(j) (amending mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, to provide greatly enhanced penalty for violation that "affects a financial institution").

**5.** Thus, the indictment in No. 90–1205 alleges that Briggs did "execute and attempt to execute a scheme and artifice *to defraud and to obtain money and funds* under the custody and control of [a federally-insured financial institution], by means of false and fraudulent pretenses, representations, and promises." *See* Record Excerpts at 52 [Record, 90–1205, v. 2, p. 4] (emphasis added). The information in No. 90–1204 is similar. *See* Record Excerpts at 46 [Record, 90–1204, v. 2, p. 2]. *See also* Record Excerpts at 61–63 (judgment orders) (specifying charges upon which Briggs was convicted).

theft of funds. Accordingly, we think the fair reading of the indictment and information is that Briggs was charged with defrauding the financial institutions of "money and funds."[6]

Under this reading, Briggs' bank fraud conviction cannot be sustained under § 1344(a)(1). She simply did not defraud the banks out of anything belonging to them.

### 2. Obtaining Funds By Means of False Representations

The second provision of former section 1344, subsection (a)(2), comes closer to Briggs' conduct. This subsection punishes anyone who

> knowingly executes, or attempts to execute, a scheme or artifice ... to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises

See former 18 U.S.C. § 1344 & 1344(a)(2).

As the funds in this case were not owned by the banks, the parties focused their discussion on the "custody or control" language. It is unclear how to square this phrase with the legislative history, which emphasizes that the purpose of the statute is the protection of financial institutions themselves.[7] Is the financial institution the victim in a scheme whose execution causes it no loss?[8] Briggs says no. Noting the dangers that inhere in over-federalizing garden variety fraud, she suggests that the "custody or control" language only applies where the defendant is an employee of the bank from which she obtains the funds. This interpretation, although imaginative, finds no support in the statutory text or legislative history, other than the need to reconcile or ignore the apparent textual inconsistency.

We turn instead to another clause of subsection (a)(2), the requirement that the scheme be "by means of false or fraudulent pretenses, representations, or promises." So far as the sparse record discloses, Briggs made no explicit false representations, statements, or promises in carrying out her scheme.[9] Not surprisingly, the government contends that her wire transfer instructions to the bank contain

---

**6.** In analyzing the language of these documents, our reasoning mirrors that of *McNally v. United States,* 483 U.S. 350, 357–59, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987), which considered the mail fraud statute and interpreted the disjunction "or for obtaining money or property by false or fraudulent pretenses, representations, or promises" primarily as a gloss upon "to defraud." *See also United States v. Blackmon,* 839 F.2d 900, 905 n. 5 (2d Cir.1988) (applying *McNally* reasoning to bank fraud statute). We have adopted a somewhat different understanding of the bank fraud statute. *See United States v. Medeles,* 916 F.2d at 198 & n. 4 (bank fraud statute "establishes two different offenses, though each shares common elements (and may otherwise somewhat overlap)").

Whether the *Medeles* understanding is consistent with *McNally,* in light of the fact that the bank fraud statute is modeled on the mail fraud statute, is a question we need not reach. Here, we deal not with the statute itself but with an indictment. True, the language of the indictment tracks the statute fairly closely, although the indictment uses the conjunctive "and" where the statute has "or" ("a scheme and artifice to defraud *and* to obtain money and funds"). But this similarity of language does not mean that a vague indictment can be fleshed out using the tools of statutory construction. The constitu-

tional requirement that an indictment put the defendant on fair notice leaves less room for elasticity of interpretation than the requirement that a statute not be unconstitutionally vague. Accordingly, we hold that an indictment or information whose wording specifies only "money and funds" cannot be read as charging deprivation of an intangible property right.

**7.** For example, the Senate Judiciary report says that § 1344 is "designed to provide an effective vehicle for the prosecution of frauds *in which the victims are financial institutions.*" See S.Rep. No. 225, 98th Cong., 2d Sess. 377–79 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3517–19 (emphasis added); *see also id.* at 3519 (similar).

**8.** We distinguish unconsummated schemes whose successful completion would have caused loss.

**9.** A fuller record, detailing the operation of Briggs' scheme, might have led to a different conclusion. Close scrutiny—obviously impossible when the record provides almost nothing to scrutinize—may reveal misrepresentations that otherwise remain latent. *See, e.g., United States v. Robichaux,* 698 F.Supp. 107 (E.D.La.1988)

*implicit* false representations or pretenses, to the effect that the transfers were within the scope of her authority.

Logical as this contention might be, it is foreclosed by our precedent. In *United States v. Medeles*, 916 F.2d 195 (5th Cir. 1990) we disapproved a similar "implicit representation" theory in the context of a check-kiting scheme. Medeles maintained checking accounts at three federally insured banks. He kited checks between these accounts, knowing the checks to be drawn on insufficient funds. In the course of this scheme, Medeles made no explicit false representations. Ultimately, he withdrew $3700 and flew to Las Vegas for a gambling spree.

Medeles was indicted and convicted under former 18 U.S.C. § 1344(a)(2).[10] The conviction was premised on the notion that by depositing the checks, Medeles implicitly represented that they were good. Since Medeles knew this to be false, the government characterized the act of depositing the checks as a (knowing) false representation.

We reversed, holding that "the depositing of a series of known insufficient funds checks does not alone constitute 'false or fraudulent pretenses, [or] representations.'" *See Medeles*, 916 F.2d at 202 (brackets in original).[11] The *Medeles* court relied on *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (5–4 decision), in which the Supreme Court considered a check kiter's conviction under a statute prohibiting the making of certain "false statement[s]" for the purpose of influencing the actions of a federally-insured bank. *See* 18 U.S.C. § 1014. In reversing the conviction, the Supreme Court reasoned:

[A] course of conduct [consisting of depositing several checks knowing them not to be supported by sufficient funds] [does] not involve the making of a "false

statement" for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." ... A check [does] not, in terms, make any representation as to the state of [one's] bank balance.

*Williams*, 458 U.S. at 284–85, 102 S.Ct. at 3091. Although this reasoning has been criticized as overly technical, *see id.* at 291–92, 102 S.Ct. at 3095 (dissenting opinion of White, J.), at 292, 295–98, 102 S.Ct. at 3095, 3097–99 (dissenting opinion of Marshall, J.); *see also United States v. Kucik*, 844 F.2d 493, 498 (7th Cir.1988) (discussing theft by false pretenses under bank robbery statute, 18 U.S.C. § 2113), we are nonetheless bound by it.

■ *Williams* and *Medeles* compel us to conclude that a wire transfer order is not accompanied by an implicit representation or pretense of authority for the transfer. If the knowing presentation of an insufficient funds check is not accompanied by an implicit representation or pretense, there is no principled way to regard wire transfer orders in a different light, particularly on a record bare of any detail about the form and content of the orders.

Nor do we view Briggs' wire transfer orders as accompanied by a "false or fraudulent ... promise[ ]." Whereas a check is a promise to pay the holder upon the dishonor of the check, *see Medeles*, 916 F.2d at 200 n. 8, we understand a wire transfer order to be simply an instruction to a bank, unaccompanied by a promise of any kind. *See, e.g.*, Subpart B of Regulation J of the Federal Reserve System, 12 C.F.R. § 210.25–.38 (1990) (defining and governing wire transfers); *Walker v. Texas Commerce Bank*, 635 F.Supp. 678, 680 (S.D. Tex.1986) (paragraph 12) (describing one bank's procedure for initiating oral wire transfers). Nothing in the record contradicts our general understanding.

(falsified sale amounts on credit card receipts deposited in bank constitute false statements under 18 U.S.C. § 1014).

**10.** The wording of the indictment and jury charge precluded conviction under subsection (a)(1).

**11.** Neither the indictment nor the charge mentioned "promises," so the *Medeles* court did not discuss that term. *See id.* at 198 n. 5.

Since Briggs cannot be considered to have made any representations, pretenses, or promises at all—false or otherwise—her bank fraud conviction cannot be sustained under subsection § 1344(a)(2). Since we have also concluded that her conviction cannot be sustained under subsection (a)(1), we conclude that her conduct did not violate the bank fraud statute

## B. Effect of Guilty Plea

■ As the government concedes, the fact that Briggs herself pled guilty, ostensibly admitting to facts supporting the charges,[12] is not itself sufficient to support her conviction. Fed.R.Crim.P. 11(f) requires that a guilty plea be supported by a factual basis.[13] As we have stressed, "each essential element of the crime" must have a factual basis. *See United States v. Montoya–Camacho*, 644 F.2d 480, 485 (5th Cir.1981); *United States v. Dayton*, 604 F.2d 931, 938 (5th Cir.1979) (*en banc*), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).

This factual basis cannot simply be implied from the fact that the defendant has pled guilty. A guilty plea is not effective as an admission of all the elements of a charge unless "the defendant possess[es] an understanding of the law in relation to the facts." *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969) (footnote omitted); *cf. Menna v. New York*, 423 U.S. 61, 63 n. 2, 96 S.Ct. 241, 242 n. 2, 46 L.Ed.2d 195 (1975) ("voluntary and intelligent" plea of guilty operates as "an admission of factual guilt"; "factual guilt" is sufficient basis for punishment "[i]n most cases"). Accordingly, we have held that "[the] factual basis must appear in the record and must be *sufficiently specific* to allow the court to determine that the defendant's conduct was within the ambit of that defined as criminal." *United States v. Oberski*, 734 F.2d

1030, 1031 (5th Cir.1984) (emphasis added; citations omitted). The purpose of such a rule is to protect "a defendant who may plead with an understanding of the nature of the charge, but 'without realizing that his conduct does not actually fall within the definition of the crime charged.'" *Id.* (citation omitted).

"An acceptance by the district court of a guilty plea is a factual finding reviewable under the clearly erroneous standard." *Oberski*, 734 F.2d at 1031 (citation omitted); *see also Dayton*, 604 F.2d at 941. Acceptance of Briggs' plea was clearly erroneous, because it was not supported by "a factual basis for each essential element" of the charges under 18 U.S.C. § 1344. *See Montoya–Camacho*, 644 F.2d at 485. That is, the factual resume was not sufficiently specific to support the acceptance of her plea. Her conduct, as far as the record reflects, "does not actually fall within the definition of the crime charged." *See Oberski*, 734 F.2d at 1031.

## C. Remedy

Briggs requests that we "reverse" or "set aside" her bank fraud convictions if we hold, as we do, that her conduct did not violate the statute. The government concedes that the convictions are "subject to reversal" under such circumstances. Beneath these terms (and others, such as "vacate") lies an ambiguity: on remand, might the defendant be reprosecuted[14] for the same offense, or is this barred by the Fifth Amendment's Double Jeopardy Clause? Presumably Briggs, at least, hopes for reversal without possibility of retrial. This is a remedy we cannot provide in this case. Here we undertake to explain why, and to clarify the remedy we have granted in the past and grant today. Some elaboration is necessary, because guilty pleas supported by insufficient evi-

---

**12.** Briggs' admission consisted simply of an affirmative answer to an inquiry by the court as to whether the factual resume was "a correct statement." *See* Tr. of Plea of Guilty 12.

**13.** Fed.R.Crim.P. 11(f) provides:
Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment

upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.

**14.** In the case of a defendant whose conviction results from a guilty plea rather than a trial, reprosecution can take the form of requiring the defendant to replead to the original charges.

dence stand at the intersection of two lines of precedent which dictate contrary results.

 Had Briggs undergone a *trial*, and later won a reversal on the grounds that the evidence was insufficient to support a guilty verdict—grounds analogous to our holding here that the factual basis for her guilty plea was insufficient—it is clear she could not be reprosecuted. *See Burks v. United States*, 437 U.S. 1, 18, 98 S.Ct. 2141, 2150–51, 57 L.Ed.2d 1 (1978) ("Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient[;] the only 'just' remedy available for that court is the direction of a judgment of acquittal").[15] *Burks* "carve[s] a narrow exception from the [general rule] that a defendant who successfully appeals a conviction is subject to retrial." *See Tibbs v. Florida*, 457 U.S. 31, 40, 102 S.Ct. 2211, 2217, 72 L.Ed.2d 652 (1982). The rationale for this exception is twofold:

First, the Double Jeopardy Clause attaches special weight to judgments of acquittal. A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial. A reversal based on the insufficiency of the evidence has the same effect because it means that no rational factfinder could have voted to convict the defendant.

Second, *Burks* and [its companion case] *Greene* implement the principle that "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." This prohibition, lying at the core of the Clause's protections, prevents the State from honing its trial strategies and perfecting its evidence through successive attempts at conviction. Repeated prosecutorial sallies would unfairly burden the defendant and create a risk of conviction through sheer governmental perseverance. For this reason, when a reversal rests upon the ground that the prosecution has failed to produce sufficient evidence to prove its case, the Double Jeopardy Clause bars the prosecutor from making a second attempt at conviction.

*See id.* 457 U.S. at 41–42, 102 S.Ct. at 2218 (citations and footnotes omitted).

Now consider the situation of a defendant such as Briggs, whose conviction results not from a trial but from a guilty plea pursuant to Fed.R.Crim.P. 11. On its face, *Burks* is applicable: jeopardy has previously attached[16] and the conviction has been vacated as having an insufficient factual basis. The language of the *Burks* holding is broad enough to encompass a Rule 11(f) reversal. *See Burks*, 437 U.S. at 18, 98 S.Ct. at 2150–51; *see also Tibbs*, 457 U.S. at 40–41, 102 S.Ct. at 2217 (quoting *Burks*) ("Double Jeopardy Clause precludes retrial 'once the reviewing court has found the evidence legally insufficient' to support conviction"). And the policy considerations expressed in *Tibbs*, though attenuated in the Rule 11(f) context, are nonetheless present.

 Despite what might be good reasons to apply *Burks* to vacated pleas, we have not relied upon this precedent. Instead, we have followed a course sanctioned by *McCarthy v. United States*, 394 U.S. 459, 472, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), which holds that "a defendant whose plea has been accepted in violation of Rule 11 should be afforded the opportunity to plead anew." Accordingly, our practice when a plea has been accepted in violation of Rule

---

**15.** Although *Burks* was a direct appeal, its holding is equally applicable to collateral attacks. *See Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) (applying *Burks* to state prisoner seeking federal habeas relief); *Hudson v. Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981) (state habeas relief); *cf. Tapp v. Lucas*, 658 F.2d 383, 385 (Former 5th Cir. 1981) (discussing *Burks* and *Greene* in context of state prisoner seeking federal habeas relief), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2233, 72 L.Ed.2d 845 (1982).

**16.** In this Circuit, and most others, jeopardy with respect to a count attaches with the acceptance of a guilty plea to that count. *See United States v. Kim*, 884 F.2d 189, 191 (5th Cir.1989); *Fransaw v. Lynaugh*, 810 F.2d 518, 523 & n. 9, 525 (5th Cir.1987) (collecting cases), *cert. denied*, 483 U.S. 1008, 107 S.Ct. 3237, 97 L.Ed.2d 742 (1987).

11(f) is to reverse and remand for entry of a new plea.[17] *See, e.g., United States v. Graves,* 720 F.2d 821, 822, 825 (5th Cir. 1983); *Sassoon v. United States,* 561 F.2d 1154, 1159–60 (5th Cir.1977); *United States v. Johnson,* 546 F.2d 1225, 1227 (5th Cir. 1977).[18] We have done so without discussion of the Double Jeopardy Clause;[19] yet, the result of this practice, if a trial occurs on remand, or if the new plea is again "guilty," is that jeopardy attaches a second time.

This result stands in contrast to the outcome were we to apply *Burks.* Embodied in this contrast is a distinction between pleas and trials whose contours do not appear in the cases. *Burks* and its progeny do not discuss Rule 11(f), and *McCarthy* does not discuss the Double Jeopardy Clause. This is perhaps unsurprising; *Burks* did not arise in an 11(f) context and *McCarthy,* which mentions the requirement now codified as 11(f), *see* 394 U.S. at 467, 89 S.Ct. at 1171, appeared nine years before *Burks,* at a time when the law in this area was murky and unsettled. *See Burks,* 437 U.S. at 9, 98 S.Ct. at 2146 (Supreme Court holdings on the applicability of Double Jeopardy Clause to reversals for factual insufficiency were "hardly ... models of consistency and clarity").

We suggest that the justification for following *McCarthy* rather than *Burks* in 11(f) cases is that, as the Tenth Circuit enunciated in a different context, "[a] plea agreement involves a qualitatively distinct type of jeopardy from that which attaches after a trial and conviction." *See United States v. Thompson,* 814 F.2d 1472, 1479 (10th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 101, 98 L.Ed.2d 61 (1987). The values underlying the double jeopardy clause include the prevention of government harassment, *see id.;* the prevention of repeated exposure to the risk and uncertainty of trial, *see id.,* and the attendant "embarrassment, expense and ordeal [and] anxiety and insecurity," *see Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). Each of these factors is implicated to a lesser degree in plea bargains than in trials. *Cf. Bullington v. Missouri,* 451 U.S. 430, 439, 101 S.Ct. 1852, 1858, 68 L.Ed.2d 270 (1981) (Double Jeopardy Clause applies to penalty phase of Missouri capital trial notwithstanding Court's past refusal to apply clause to various oth-

17. The defendant's entitlement to this remedy also depends on whether her attack is direct or collateral. *McCarthy* was a direct appeal. In a collateral attack under § 2255, the defect must be prejudicial. Thus, the plea is vacated only if the violation of Rule 11 is jurisdictional or constitutional, or results in "a complete miscarriage of justice" or in a proceeding "inconsistent with the rudimentary demands of fair procedure," *see United States v. Timmreck,* 441 U.S. 780, 783–84, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979) (distinguishing *McCarthy* ), or if the violation "presents exceptional circumstances," *see United States v. Patterson,* 739 F.2d 191, 193, 195 (5th Cir.1984) (discussing Rule 11(c) colloquy; distinguishing *Dayton* ). A mere "technical violation" will not suffice. The *Timmreck–Patterson* test is met in Briggs' case, as a conviction for conduct that does not actually constitute the crime charged is scarcely "technical."

18. We follow this procedure on collateral as well as direct attack. *See, e.g., Sassoon,* 561 F.2d at 1155.

19. We have discussed the relationship between vacated pleas and the Double Jeopardy Clause, but in cases that do not address Rule 11(f). We have held that "when [a] defendant repudiates [a] plea bargain, either by withdrawing the plea *or by successfully challenging his conviction on appeal,* there is no double jeopardy (or other) obstacle to restoring the relationship between defendant and state as it existed prior to the defunct bargain." *See United States v. Kim,* 884 F.2d 189 (5th Cir.1989) (emphasis added) (citing *Fransaw v. Lynaugh,* 810 F.2d 518, 526 (5th Cir.1987) and *Clark v. Blackburn,* 605 F.2d 163 (5th Cir.1979)). This principle reflects "a judicial regard for fairness," *see Fransaw,* 810 F.2d at 526—here, fairness to the government—that arises out of the contractual nature of plea bargaining and a feeling, also contractual in origin, that the defendant voluntarily repudiated or abandoned the bargain. *See id.* at 524–28; *Moore v. Foti,* 546 F.2d 67 (5th Cir.1977) (alternative holding) (prisoner's "successful challenge to his plea-bargained sentence is a tacit repudiation of the bargain, allowing the government to [re]prosecute him").

None of this precedent specifically considers pleas vacated for factual insufficiency. Indeed, *Clark,* relied on by *Kim* and *Fransaw,* explicitly distinguishes "convictions" overturned on the ground of insufficiency of the evidence. *See* 605 F.2d at 164. *Fransaw* notes the *Burks* rule but takes no account of it in formulating its analysis. *See* 810 F.2d at 527 n. 15.

er sentencing procedures; result explained in part by fact that other procedures "did not have the hallmarks of [a] trial"); *Bullard v. Estelle*, 665 F.2d 1347 (5th Cir.1982) (applying *Bullington* to Texas penalty-phase proceedings). The "physical, psychological and. financial burdens" are simply greater in the case of a trial. *See United States v. Barker*, 681 F.2d 589 (9th Cir. 1982).

For these reasons, we reaffirm our past practice. We vacate Briggs' bank fraud convictions and remand for entry of a new plea.

### D. Availability of Resentencing

 Briggs asks that, if we set aside her bank fraud convictions, we also order resentencing on the remaining convictions, for transportation of stolen money. Her request is well-taken. The rule in this circuit is clearly established:

> [U]nless it can be ascertained from the record, as it now stands or after it is supplemented on remand, that the District Court's sentence on a valid conviction was not affected by a subsequently invalidated conviction on another count of the indictment, the defendant must be resentenced on the valid conviction.

*Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir.1976); *see also Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir.1986) (where "it cannot be ascertained from [the] record that the sentence on the [valid] conviction was not affected by the invalid ... convictions," defendant is entitled to a remand for resentencing) (citing *Jerkins*).

Here, the district court explained its sentencing decision on all six counts with a single narrative referring to Briggs' "activity [which] occurred over a fairly long period of time." [20] It seems likely that the court considered her activities as a whole, including her now-invalidated guilty plea on the bank fraud counts. Certainly, the negative of this proposition cannot be "ascertained from the record, as it now stands." Accordingly, we vacate Briggs' sentence on the transportation of stolen money charges, and remand for supplementation of the record or resentencing consistent with our precedent.

### III. Conclusion

For the reasons stated in this opinion, we REVERSE the district court's denial of relief. We VACATE Briggs' conviction on the two counts of bank fraud and REMAND to permit her to replead to those counts. We VACATE her sentences on the four transportation of stolen money charges and REMAND for further proceedings consistent with part IIC of this opinion.

---

**20.** The court's explanation was as follows:

> In view of the amounts of loss involved, even though this is a first offense, I believe that a custody sentence is appropriate. I think my first consideration in imposing sentence has to be punishment and deterrence, and that is confirmed or ratified by also the fact that this activity occurred over a fairly long period of time, was carefully planned and although you later decided to cooperate was not initially brought to light by yourself, and as I understand the facts that you agree to, was really brought to light more by the cooperation of your codefendant, Mr. Meinardus than by you.

*See* Tr. of Sentencing Hearing 35.